**16 MAG      6546**

ORIGINAL

U.S. DISTRICT COURT
FILED
OCT 12 2016
S.D. OF N.Y.

APPROVED:

GEORGE D. TURNER / SHAWN G. CROWLEY
Assistant United States Attorneys

BEFORE:   THE HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York

DOC #
# 300

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :    **SEALED COMPLAINT**

        - v. -                      :    Violations of
                                         21 U.S.C. §§ 963 & 959;
HAMIT NASIRLIOGLU,                  :    18 U.S.C. §§ 924(o),
    a/k/a "James Nasirlioglu,"           3238 & 2
                                    :
        Defendant.
                                    :

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

MICHAEL CONNOLLY, being duly sworn, deposes and says that
he is a Special Agent of the Drug Enforcement Administration
("DEA"), and charges as follows:

**COUNT ONE**
**(Narcotics Importation Conspiracy)**

1.    From at least in or about the fall of 2015, up to and
including in or about October 2016, in the Southern District of
New York and elsewhere, and in an offense begun and committed
out of the jurisdiction of any particular State or district,
HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, who
is expected to be first brought to and arrested in the Southern
District of New York, and whose point of entry into the United
States is expected to be in the Southern District of New York,
and others known and unknown, intentionally and knowingly did
combine, conspire, confederate, and agree to violate the
narcotics laws of the United States.

2.    It was a part and object of the conspiracy that HAMIT
NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, and
others known and unknown, would and did distribute, and possess
with intent to distribute, a controlled substance, to wit, five
kilograms and more of mixtures and substances containing a

detectable amount of cocaine, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States from a place outside thereof, in violation of Sections 812, 959(a), 959(d), 960(a)(3), 960(b)(1)(B), and 963 of Title 21, United States Code.

## Overt Acts

3.   In furtherance of the conspiracy, and to effect the illegal object thereof, HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, and others known and unknown, committed the following overt acts, among others:

a.   On or about December 5, 2015, NASIRLIOGLU met with a DEA confidential source ("CS-1") in a particular country ("Country-1") to discuss supplying weapons to CS-1 and his/her associates for the protection of cocaine shipments into the United States (the "Weapons Transaction").

b.   On or about June 22, 2016, NASIRLIOGLU and two co-conspirators ("CC-1" and "CC-2") met with CS-1 and a second DEA confidential source ("CS-2") in a particular country ("Country-2") to discuss the Weapons Transaction.

c.   On or about June 24, 2016, NASIRLIOGLU met with CS-1 in Country-1 to discuss the Weapons Transaction.

d.   On or about August 2, 2016, CC-1 and CC-2 met with CS-1, CS-2, and a third DEA confidential source ("CS-3") in a particular country ("Country-3") to discuss the Weapons Transaction.

e.   On or about August 19, 2016, CC-1 and CC-2 met with CS-1, CS-2, and CS-3 in Country-3 to discuss the Weapons Transaction, during which meeting CC-1 and CC-2 showed various types of military-grade weapons to the confidential sources.

f.   On or about September 16, 2016, NASIRLIOGLU participated in a telephone call with CS-1 and CS-3 to discuss the Weapons Transaction.

(Title 21, United States Code, Sections 963 and 959(d); Title 18, United States Code, Section 3238.)

## COUNT TWO
### (Attempted Narcotics Importation)

4.    From at least in or about the fall of 2015, up to and including in or about October 2016, in the Southern District of New York and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, who is expected to be first brought to and arrested in the Southern District of New York, and whose point of entry into the United States is expected to be in the Southern District of New York, intentionally and knowingly did attempt to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, from a place outside thereof, in violation of Sections 959(a), 959(d), 960(a)(3), 960(b)(1)(B), and 963 of Title 21, United States Code.

5.    The controlled substance involved in the offense was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Sections 812, 960(a)(3), and 960(b)(1)(B) of Title 21, United States Code.

(Title 21, United States Code, Sections 963 and 959(d); Title 18, United States Code, Section 3238.)

## COUNT THREE
### (Conspiracy to Aid and Abet the Possession of Firearms in Furtherance of a Drug Trafficking Offense)

6.    From at least in or about the fall of 2015, up to and including in or about October 2016, in the Southern District of New York and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, who is expected to be first brought to and arrested in the Southern District of New York, and others known and unknown, did combine, conspire, confederate, and agree to aid and abet the use and carrying of firearms, including machineguns, during and in relation to, and the possession of firearms, including machineguns, in furtherance of, a drug trafficking crime for which they may be prosecuted in a court of the United States, namely, the narcotics importation offense charged in Count One.

<u>Overt Acts</u>

7.     In furtherance of the conspiracy and to effect the illegal object thereof, HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, and others known and unknown, committed the overt acts alleged in Paragraph 3 above, among others, which acts are realleged and incorporated as if set forth here in full.

(Title 18, United States Code, Sections 924(o), 2, and 3238.)

The bases for my knowledge and the foregoing charges are as follows:

8.     I have been a DEA Special Agent since 2009.  I am currently assigned to the DEA Special Operations Division's Bilateral Investigations Unit, which focuses on international criminal activities.  During my time as a DEA Special Agent, I have become familiar with some of the ways in which narcotics traffickers operate, and have participated in numerous investigations involving international drug trafficking.  I have been personally involved in the investigation of this matter. This affidavit is based on my communications with other law enforcement officers and other individuals, and on my review of various reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all of the facts that I have learned during the course of the investigation.  Where the contents of communications with others and statements by others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

9.     As set forth in greater detail below, since the fall of 2015, HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, CC-1, CC-2, and others known and unknown, have conspired to supply military-grade weapons to three individuals whom they understood to be associates of a Mexican drug trafficking organization (the "DTO"), for the purpose of protecting the DTO's cocaine shipments into the United States. Those three purported associates of the DTO are, in fact, DEA

confidential sources ("CS-1," "CS-2," "CS-3," and, collectively, the "CSes"[1]).

10.   Over the past year, HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, CC-1, and CC-2 have engaged in a series of recorded meetings and telephone calls, as well as text and audio messages, with the CSes to arrange the sale of weapons to the CSes, *i.e.*, the Weapons Transaction.  In the fall of 2015, CS-1 was introduced to NASIRLIOGLU, who acted as a broker for the Weapons Transaction.  See infra ¶ 13.  In December 2015, NASIRLIOGLU met CS-1 in Country-1, and they discussed arranging the Weapons Transaction.  See infra ¶ 15.  Between December 2015 and June 2016, NASIRLIOGLU continued communicating with CS-1 and lined up sellers for the Weapons Transaction: CC-1 and CC-2.  See infra ¶ 16.  In late June 2016, at a meeting in Country-2, NASIRLIOGLU introduced CC-1 and CC-2 to CS-1 and CS-2, and the parties discussed the terms of the Weapons Transaction.  See infra ¶ 17.

11.   The CSes began communicating directly with CC-1 and CC-2, and in early August 2016, the CSes met CC-1 and CC-2 in Country-3 to continue discussing the terms of the Weapons Transaction.  See infra ¶¶ 20-22.  On or about August 19, 2016, the CSes met again with CC-1 and CC-2 in Country-3, and CC-1 and CC-2 took the CSes to two warehouses to show the CSes their stockpiles of military-grade weapons, including machineguns, missiles, and amphibious assault vehicles.  See infra ¶¶ 23-25.  At that meeting, CC-1 and CC-2 also provided the CSes with an invoice reflecting that, in the initial phase of the Weapons Transaction, CC-1 and CC-2 would supply the CSes with over 5,000 machineguns at a total price of €2,000,000.  See infra ¶ 26(b).  Since that meeting, the CSes have remained in contact with CC-1 and CC-2, and with HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu,"

---

[1] CS-1 and CS-2 have been paid DEA sources since 2014 and have each worked on several investigations.  During that time, information provided by CS-1 and CS-2 has proven reliable and has been corroborated by independent evidence, including audio/video recordings and other source information.

CS-3 has been a paid DEA source since 1996 and has worked on numerous investigations.  During that time, information provided by CS-3 has proven reliable and has been corroborated by independent evidence, including audio/video recordings and other source information.

the defendant, regarding the execution of the Weapons
Transaction.  See infra ¶ 27.

        12.   At various points during their meetings, calls, and
other communications with HAMIT NASIRLIOGLU, a/k/a "James
Nasirlioglu," the defendant, CC-1, and CC-2, as described below,
the CSes explained that the weapons supplied to the CSes would
be used by the DTO to protect its cocaine shipments into the
United States.

### The Investigation

        13.   Based on my communications with CS-1 and my review of
DEA reports, I have learned the following:

        a.   In or about the fall of 2015, CS-1 was introduced
to an associate of HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu,"
the defendant ("CC-3").  During telephone conversations with CC-
3, CS-1 informed CC-3, in substance and in part, that CS-1
represented a client seeking to purchase military-grade weapons.
In or about late September 2015, CS-1 sent a text message to CC-
3 listing weapons that CS-1's purported client was seeking to
acquire ("Weapons List-1"), including assault rifles,
machineguns, rocket-propelled grenades ("RPGs"), hand grenades,
and anti-tank missiles.

        b.   On or about October 12, 2015, CS-1 met with CC-3
in a particular country ("Country-4").  At that meeting, CC-3
informed CS-1, in substance and in part, that CC-3 represented a
certain associate, who has since been identified as HAMIT
NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, as
described herein, see, e.g., infra ¶¶ 14, 16(h), 19(c).  CC-3
told CS-1 that CC-3 would inform NASIRLIOGLU that CS-1 was
seeking to arrange a weapons transaction.  CC-3 also provided
CS-1 with a particular telephone number for NASIRLIOGLU (the
"NASIRLIOGLU Number").  CS-1 requested that CC-3 transmit
Weapons List-1 to NASIRLIOGLU.

### October and November 2015: The Defendant Communicates with CS-1 and Sends Images of Weapons

        14.   Based on my communications with CS-1 and my review of
DEA reports, consensually recorded telephone calls, and text and
audio messages exchanged between HAMIT NASIRLIOGLU, a/k/a "James
Nasirlioglu," the defendant, and CS-1 via a messaging
application for cellphones (the "Application"), I have learned
the following:

6

a.   In or about late October 2015, CS-1 contacted the
NASIRLIOGLU Number, and began communicating with NASIRLIOGLU,
who used the alias "James."  Over the ensuing weeks, at the
direction of the DEA, CS-1 maintained contact with NASIRLIOGLU
through a series of recorded telephone calls, as well as text
and audio messages via the Application.  CS-1 posed as an
associate of a Mexico-based drug cartel, the DTO.  In the course
of their communications in the fall of 2015, CS-1 informed
NASIRLIOGLU that the DTO needed weapons to protect shipments of
cocaine that the DTO was transporting from Mexico into the
United States.  The communications between NASIRLIOGLU and CS-1
included the following, in substance and in part:

i.   On or about October 29, 2015, during a recorded
telephone call, CS-1 stated that he/she was calling about "the
order for Mexico, the weapons."[2]  CS-1 explained that the
transaction would not be "legit," and that the buyer did not
have any importation documents.  NASIRLIOGLU conveyed that he
had previously engaged in multiple such "unofficial" weapons
deals.  CS-1 referred to Weapons List-1, and NASIRLIOGLU
confirmed that he had received Weapons List-1.  NASIRLIOGLU
indicated that he would start organizing the Weapons
Transaction, and that he anticipated engaging associates who
were from a particular country ("Country-5").  CS-1 informed
NASIRLIOGLU that the buyer is a "cartel" in Mexico.  NASIRLIOGLU
stated: "I understand your conditions completely."  NASIRLIOGLU
and CS-1 agreed to use the Application to continue communicating
regarding the Weapons Transaction.

ii.   Later that day (October 29, 2015), NASIRLIOGLU
sent multiple audio messages to CS-1 via the Application.  In
those audio messages, NASIRLIOGLU informed CS-1 that he
(NASIRLIOGLU) was in contact with a prospective "seller" for the
Weapons Transaction, and referenced a "manufacturer" located in
a particular city in Country-5.  NASIRLIOGLU indicated that he
would serve as a "consultant" in the Weapons Transaction in
exchange for a "consultancy fee" equal to "20, 25 percent" of
the contract price.

iii.   On or about November 5, 2015, NASIRLIOGLU and
CS-1 exchanged audio messages via the Application.  In those

---

[2] All quotations in this Complaint drawn from telephone calls,
audio messages, and meetings are based on a review of audio
recordings, video recordings, and/or preliminary draft
transcripts and translations, and are thus subject to revision
upon the preparation of finalized transcripts and translations.

audio messages, NASIRLIOGLU asked CS-1 to specify "the final destination of the product you need," and the "minimum prices for AK-47," as "the seller is asking."  CS-1 responded that the final destination was Mexico, and provided prices that the buyer was willing to pay for AK-47 assault rifles.

        iv.  On or about November 12, 2015, NASIRLIOGLU sent an audio message to CS-1 via the Application, stating that he planned to travel to Country-5 with an associate to inspect the "factory."  Based on my training, experience, and participation in this investigation, I believe that "factory" was a reference to a weapons manufacturing facility in Country-5.

        v.  On or about November 20, 2015, NASIRLIOGLU sent CS-1, via the Application, a series of images of what appear to be pages from a weapons catalogue, depicting weapons and listing their specifications (such as caliber, weight, and range). NASIRLIOGLU indicated that the depicted weapons represented the types of weapons that were available for purchase from the sellers.  Below are several examples of the images sent by NASIRLIOGLU, which included headings identifying the type of weapon:





RPG - 7 Anti - Tank grenade launcher

9M113 Concourse Anti-tank guided missile system

12.7 Machine Gun NSVP

AK-47 Assault Rifle

Hand Fragmentation Grenade F1 (Defensive)

### December 5, 2015: Meeting with the Defendant

15.   On or about December 5, 2015, at the DEA's direction, CS-1 met with HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, and an associate, in Country-1 (the "December 2015 Meeting"). Based on my communications with CS-1 and review of DEA reports, I have learned that the following occurred during the December 2015 Meeting, in substance and in part:

a.   CS-1 reiterated that he/she represented a Mexican cartel that needed military-grade weapons.

b.   NASIRLIOGLU confirmed that he could arrange for the sale of military-grade weapons to CS-1 and his/her associates.

### January-June 2016: The Defendant Remains in Contact with CS-1 and Sends a Weapons Pricing List on Behalf of CC-1 and CC-2

16.   Based on my communications with CS-1 and review of DEA reports, consensually recorded telephone calls, and text and audio messages exchanged between HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, and CS-1 via the Application, I have learned the following:

a.   In the months following the December 2015 Meeting, NASIRLIOGLU continued communicating with CS-1 about, among other things, the Weapons Transaction, as well as the narcotics trafficking business of the DTO.

b.   On or about January 1, 2016, NASIRLIOGLU and CS-1 exchanged text and audio messages regarding the Weapons Transaction. In the course of those messages, CS-1 informed NASIRLIOGLU (via text message) that "we have this month big shipment coming to Europe." CS-1 elaborated (via audio message) that the "product" was "from Colombia and Mexico." NASIRLIOGLU and CS-1 then engaged in the following exchange:

> NASIRLIOGLU (text): Ah ok. Drg ?
>
> CS-1 (text):        Lol
>
> CS-1 (text):        Yes
>
> CS-1 (audio):       Yeah, the white one, the good stuff, very good.
>
> NASIRLIOGLU (text): Ok.

```
CS-1 (audio):        Did you check with your
                     friend, the one you told
                     me about it?

NASIRLIOGLU (text):  Brother i ca[n] do this
                     business too. And i spoke
                     with my father's friend.
                     He ask me where it come
                     from and i told him
                     colombia or mexico . . . .
```

Based on my training, experience, and participation in this
investigation, I believe that, in the foregoing exchange,
NASIRLIOGLU acknowledged that he understood that CS-1's
associates were engaged in trafficking narcotics ("Drg"),
specifically cocaine ("the white one") from Colombia or Mexico,
and that NASIRLIOGLU also indicated his interest in
participating in the DTO's cocaine-trafficking activities
("Brother i ca[n] do this business too").

       c.    On or about April 15, 2016, NASIRLIOGLU sent CS-
1, via text message, a photograph of a weapons pricing list
("Weapons List-2").  Weapons List-2 listed the prices and
available quantities of ten types of weapons, including multiple
models of assault rifles ("AKM" and "AKMC"), "RPG-7" launchers,
"ZSU-2" anti-aircraft guns, and "Konkurs" anti-tank missiles.
Based on my training, experience, and review of open-source
materials, I believe that all of the models of weapons
identified in Weapons List-2 originate from Country-5.

       d.    On or about April 16, 2016, NASIRLIOGLU informed
CS-1, via audio message, that Weapons List-2 had been provided
by the prospective seller, and that the prices reflected on
Weapons List-2 were "for unofficial deal."

       e.    On or about April 17, 2016, during a recorded
telephone call, NASIRLIOGLU and CS-1 discussed arranging a
meeting with the seller, whom NASIRLIOGLU indicated was from
Country-5.

       f.    On or about May 4, 2016, NASIRLIOGLU and CS-1
exchanged text and audio messages.  In the course of that
exchange, NASIRLIOGLU sent CS-1 a text message stating that he
(NASIRLIOGLU) had "met a man doing weps business" who asked
NASIRLIOGLU "if your [*i.e.*, CS-1's] mexican group can make
exchange weps and detergent."  CS-1 responded, via audio
message, that he/she was unsure of what NASIRLIOGLU meant.
NASIRLIOGLU sent a text message to CS-1 clarifying:  "Cola.

Coca Amigo coca." Based on my training, experience, and participation in this investigation, I believe that, in the foregoing exchange, NASIRLIOGLU was inquiring whether the DTO ("mexican group") was willing to pay for weapons ("weps") by providing cocaine — which NASIRLIOGLU referred to as "detergent" and then, more explicitly, as "coca."

       g.   In or about May 2016, NASIRLIOGLU sent CS-1, via text message, screenshots of text messages that NASIRLIOGLU had exchanged with an associate, whose contact information as it appears in NASIRLIOGLU's cellphone includes the first name of CC-1 and Country-5 — and whom I believe, based on my participation in this investigation and the facts discussed in this Complaint, to be CC-1. In screenshots of that exchange, NASIRLIOGLU and CC-1 discussed selling weapons to the DTO and arranging to meet with representatives of the DTO (*i.e.*, the CSes). The text messages exchanged between NASIRLIOGLU and CC-1 included the following:

       i.   NASIRLIOGLU alluded to the "prices" and "quantities" specified by CC-1, and CC-1 confirmed that the goods would come from Country-5.

       ii.   CC-1 stated: "Just talked to the factory.they said they can get a container with most of guns and ammo ready in 3-4 weeks if good adv.payment is paid."

       iii.   CC-1 stated to NASIRLIOGLU that he (CC-1) would not "feel safe[]" meeting with representatives of the DTO in a particular country "coz its controlled by americans," and then asked NASIRLIOGLU if "your friends are American agents?"

       iv.   After further discussion, NASIRLIOGLU and CC-1 agreed that the meeting would take place in June in Country-2.

       v.   CC-1 subsequently informed NASIRLIOGLU: "We ll be there on 22nd." As discussed below, on or about June 22, 2016, CS-1 and CS-2 met with NASIRLIOGLU, CC-1, and CC-2 in Country-2.

       h.   On or about June 20, 2016, NASIRLIOGLU sent a text message to CS-1 identifying himself as "Hamit" and providing an email address that contains "h.j.nasirlioglu."

**June 22, 2016: Meeting with the Defendant, CC-1, and CC-2**

   17.   On or about June 22, 2016, at the DEA's direction, CS-1 and CS-2 met in Country-2 with HAMIT NASIRLIOGLU, a/k/a "James

11

Nasirlioglu," the defendant, CC-1, and CC-2 (the "June 22, 2016 Meeting"). I, along with another DEA agent, conducted surveillance of the June 22, 2016 Meeting, which was audio- and video-recorded. Based on my review of DEA reports, recordings of the June 22, 2016 Meeting, and a draft transcript of the June 22, 2016 Meeting,[3] and my communications with CS-1 and CS-2, I have learned that the following occurred during the June 22, 2016 Meeting, in substance and in part:

a.   CC-1 stated that "James [i.e., NASIRLIOGLU] sent me a list of what you require," which I believe was a reference to Weapons List-1, see supra ¶¶ 13(a), 14(a)(i). CC-1 further stated that "we can deliver pretty much everything."

b.   CS-2, posing as a member of the DTO, explained that the weapons acquired in the Weapons Transaction would be used in Mexico. CS-1 referenced the DTO's importation of drugs into the United States, stating that "when [we] send the guy with a project [i.e., narcotics] from Mexico to the U.S. like always he's carrying a bag [i.e., survival kit] in case he gets shot."

c.   CC-1 conveyed that he understood that "you guys [i.e., the CSes] don't have any documents" — that is, that the Weapons Transaction would be illegal.

d.   CS-1 referred to "the list you send me with the price list, I got from James" — that is, Weapons List-2, which CC-1 and CC-2 had provided to NASIRLIOGLU, who, in turn, sent it to CS-1. See supra ¶¶ 16(c)-(d). The parties proceeded to discuss the prices reflected on Weapons List-2.

e.   CC-1 indicated that CC-1 and CC-2 conduct at least some of their weapons-trafficking business in Country-3 (which is in Europe), stating that "[w]e have a company in [Country-3]." CC-1 further conveyed that CC-1 and CC-2 had access to military-grade weapons both in Country-3 and at warehouses in a particular country in Central America ("Country-6"). It was agreed that the next meeting regarding the Weapons Transaction would take place in Country-3.

---

[3] The June 22, 2016 Meeting was conducted principally in English. From time to time during the course of the meeting, CC-1 and CC-2 spoke to each other in Russian, which I do not speak.

**June and July 2016: Meeting and Continued Communications with the Defendant**

18.   Two days later, on or about June 24, 2016, CS-1 met with HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, at the DEA's direction, in Country-1 (the "June 24, 2016 Meeting"), and the meeting was audio-recorded.  Based on my review of that recording and DEA reports, and my communications with CS-1, I have learned that the following occurred during the June 24, 2016 Meeting, in substance and in part:

        a.   CS-1 again explained to NASIRLIOGLU that the DTO's reason for acquiring military-grade weapons was to protect the movement of narcotics from Mexico to the United States.  CS-1 told NASIRLIOGLU that the DTO's "drugs" are moved "from Mexico through the United States."  CS-1 conveyed that it was "very important" for the DTO to acquire weapons because "[w]ithout weapons, it's fucked," as the DTO's transporters would be "attacked from the government or . . . attacked from the gangsters."

        b.   NASIRLIOGLU conveyed that he understood, and indicated that "for this" — *i.e.*, acquiring weapons to protect narcotics shipments — the CSes should "continue with the [Country-3] company," which I believe was a reference to CC-1 and CC-2, who appear to operate a weapons-trafficking business based in Country-3, as described herein, see <u>supra</u> ¶ 17(e), <u>infra</u> ¶¶ 21(f), 25(c)-(d).

19.   Based on my communications with CS-1 and my review of DEA reports, consensually recorded telephone calls, and text messages exchanged between HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, and CS-1 via the Application, I have learned the following:

        a.   In the weeks following the June 24, 2016 Meeting, NASIRLIOGLU continued communicating with CS-1 about, among other things, the pending Weapons Transaction.

        b.   On or about July 7, 2016, during a recorded telephone call, NASIRLIOGLU and CS-1 negotiated the size of the fee that NASIRLIOGLU would be paid for his role in the Weapons Transaction.

        c.   On multiple occasions in or about June and July 2016, in the course of NASIRLIOGLU's communications with CS-1, NASIRLIOGLU sent text messages to CS-1 providing his (NASIRLIOGLU's) bank account information.  The identifying

information provided by NASIRLIOGLU for that account includes, among other information, the beneficiary name "Hamit Nasirlioglu."

       d.  On or about July 10, 2016, CS-1 informed NASIRLIOGLU that the CSes were interested in seeing samples of the weapons available for purchase.  NASIRLIOGLU conveyed that he would relay the CSes' request to the sellers (*i.e.*, CC-1 and CC-2).  NASIRLIOGLU noted that it might not be feasible for the CSes to see samples of "the big ones . . . the missiles."

       e.  On or about July 14, 2016, CS-1 informed NASIRLIOGLU that he/she was busy assisting the DTO with importing narcotics to New York, stating:  "We have some shipments going to New York this week" and "the shipment to New York is very important."

       f.  On or about July 13, 2016, NASIRLIOGLU sent CS-1 a Microsoft Excel spreadsheet (as an attachment to a text message), containing a list of 12 types of military-grade weapons with corresponding prices ("Weapons List-3").  NASIRLIOGLU indicated that Weapons List-3 had been provided by CC-1 and CC-2.  As discussed below, Weapons List-3 was subsequently discussed at a meeting among CC-1, CC-2, and the CSes on or about August 2, 2016.  See *infra* ¶ 21(b).

### August 2, 2016: Meetings with CC-1 and CC-2

    20.  On or about August 2, 2016, at the DEA's direction, the CSes conducted two meetings with CC-1 and CC-2 in a particular city ("City-1") in Country-3 (the "August 2, 2016 Meetings").

### First Meeting on August 2, 2016

    21.  All three CSes met with CC-1 and CC-2 in the first meeting on August 2, 2016 (the "First August 2, 2016 Meeting"), which was audio- and video-recorded.  Law enforcement personnel from Country-3 conducted surveillance of the First August 2, 2016 Meeting.  Based on my review of DEA reports, recordings of the First August 2, 2016 Meeting, and a draft transcript and

translation of the First August 2, 2016 Meeting,[4] and my communications with the CSes, I have learned that the following occurred at the First August 2, 2016 Meeting, in substance and in part:

      a.   CS-2 introduced CS-3 to CC-1 and CC-2 as CS-2's partner, another member of the Mexican DTO.

      b.   CC-1, CC-2, and the CSes engaged in a detailed discussion regarding the prices, quantities, and specifications of the weapons itemized on Weapons List-3 (i.e., the weapons list that HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, had sent to CS-1 on behalf of CC-1 and CC-2, see supra ¶ 22(e)).  CC-1 made handwritten notes, reflecting the terms discussed by the parties, on a copy of Weapons List-3 that CS-1 had brought to the First August 2, 2016 Meeting.  At the end of the meeting, CS-1 retained the marked-up copy of Weapons List-3, and later provided it to me.

      c.   In the course of discussing NASIRLIOGLU's role in the Weapons Transaction, CC-1 stated that "James is our partner" and "we're working with him."

      d.   The CSes again explained that the DTO was seeking military-grade weapons, particularly anti-aircraft guns, for the purpose of protecting shipments of cocaine into the United States.  For example:

         i.   CS-2 conveyed that the DTO imported "100 kilos" at a time into the United States, packaged as "blocks . . . of cocaine."

         ii.   The parties discussed different potential methods of transporting hundreds of kilograms of cocaine across the U.S.-Mexican border, including by aircraft.

         iii.   CS-1 explained that the DTO had a "problem with the delivery from Mexico to America" and "we don't have enough to protect our project."  CS-1 further explained that the DTO especially "want the anti-aircraft" to address transport difficulties in Colombia, where "the coca plant is produced."

--------------------------------------------------

[4] The First August 2, 2016 Meeting was conducted principally in English.  From time to time during the course of the meeting, CC-1 and CC-2 spoke to each other in Russian.  I have reviewed preliminary draft translations of portions of the conversations between the LYUBISHINS.

        iv.    CC-1 indicated that he understood, and discussed supplying "20-millimeter" or "23-millimeter" anti-aircraft guns to the CSes.

        e.    At various points during the meeting, CC-1 and CC-2 spoke to each other in Russian (which they understood the CSes not to understand), and discussed, among other things, the specifications of the weapons that they were offering to the CSes and the drug trafficking business of the DTO.  For example:

        i.    CS-2 asked about the model of "AK" assault rifle listed on Weapons List-3.  CC-1 turned to CC-2 and asked (in Russian):  "AKs — who are the manufacturer and when they were made?"  CC-2 responded (in Russian):  "Soviet AKs . . . Most likely they were made in 1972 to 1978.  But we can supply new AKs.  It depends on their wish."

        ii.    In the course of discussing the possibility of the DTO using aircraft to transport cocaine into the United States, CC-2 stated (in Russian) to CC-1, among other things, that "a helicopter . . . will cost about a million" and "[i]t will take between 200 to 300 kilograms," which I understand, based on my training, experience, and participation in this investigation, to refer to a quantity of narcotics, specifically cocaine.

        iii.    In the course of discussing the "SPG-9" — which I know, based on my training and experience, to be a type of tripod-mounted, anti-tank gun — CC-2 told CC-1 (in Russian) that "[t]hey can be transported in a pickup car."  CC-1 relayed to the CSes, "it can be installed in a jeep."

        f.    CC-1 informed the CSes that "[w]e have a base here" (*i.e.*, in Country-3).  During the meeting, CC-2 gave the CSes two business cards (the "Business Cards"), one in Russian, the other in English.  Among other things, the Business Cards identify a particular company associated with CC-1 and CC-2 (the "Company"), and provide an address located outside City-1, in Country-3.

        g.    The parties discussed structuring the Weapons Transaction such that the CSes would make an initial payment of $1 million or $2 million to CC-1 and CC-2 in Country-3, covering weapons that were available at CC-1 and CC-2's facilities in Country-3, and that the CSes would subsequently make further payments upon receipt of additional weapons from CC-1 and CC-2's facilities in Country-6.

h.     Towards the end of the meeting, the CSes asked CC-1 and CC-2 to provide an informal invoice or contract reflecting the terms of the Weapons Transaction (the "Term Sheet").  CC-1 conveyed that he would prepare such a document that day, and it was agreed that CC-1 and CC-2 would provide the Term Sheet to the CSes at a subsequent meeting that night.

### Second Meeting on August 2, 2016

22.     Later that night (of August 2, 2016), at the DEA's direction, CS-1 and CS-2 met with CC-1 and CC-2 in City-1 (the "Second August 2, 2016 Meeting").  I, along with another DEA agent, conducted surveillance of the Second August 2, 2016 Meeting, which was audio- and video-recorded.  Based on my review of DEA reports and recordings of the Second August 2, 2016 Meeting,[5] and my communications with CS-1 and CS-2, I have learned that the following occurred at the Second August 2, 2016 Meeting, in substance and in part:

a.     I observed CC-1 and CC-2 arrive at the Second August 2, 2016 Meeting and engage in conversation with CS-1 and CS-2.  I recognized CC-1 and CC-2 as the same two individuals whom I had previously observed with HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, CS-1, and CS-2 at the June 22, 2016 Meeting described above.  See supra ¶ 17.

b.     Consistent with the discussion at the close of the First August 2, 2016 Meeting, see supra ¶ 21(h), CC-1 and CC-2 provided a Term Sheet pertaining to the Weapons Transaction to the CSes.  I have reviewed the Term Sheet, which included the following information:

i.     The Term Sheet stated that the "[Country-3] company" (i.e., CC-1 and CC-2's Company) was "ready to sell the following goods immediately to [Country-6] military company," and then listed three different types of machineguns (KPVT, SGMT, and PKT) and an anti-aircraft gun (Zu-23-2).  As described above, CC-1 and CC-2 had previously indicated that the DTO's representatives would need to pick up a portion of the purchased weapons from CC-1 and CC-2's warehouse in Country-6.  See supra ¶ 21(g).  Based on my training, experience, and participation in this investigation, I believe that the term "[Country-6] military company" on the Term Sheet was used as a cover for the

---

[5] The Second August 2, 2016 Meeting was conducted principally in English.  From time to time during the course of the meeting, CC-1 and CC-2 spoke to each other in Russian.

identity of the buyer, which CC-1 and CC-2 understood to be the DTO.

        ii.   The Term Sheet indicated that the Country-3 company could also "pre order the following goods," and then listed, among other weapons:  "2000 x hand grenades . . . 500 x RPG-7 launcher . . . [and] 30 x Dragunov sniper rifle."

        iii.   The Term Sheet stated that "[a]n advance payment of 1,5 million Euros" would be required for "goods+organization+logistics."

        iv.   The Term Sheet indicated that if the advance payment exceeded the value of the weapons delivered in Country-3, "the [Country-3] company can include other assets as well as up to 10 pieces of BTR-80 Amphibious Armored Personell Carrier . . . as a guarantee for the advance payment."

        v.   The Term Sheet indicated that the Weapons Transaction would include "[o]rganization of the clear root between [Country-3] and [Country-6] companies, acquisition of all documents and legal paper work."  Based on my training, experience, and participation in this investigation, I believe that this was a reference to the generation of false documentation, such as end-user certificates, designed to make the illegal sale of weapons appear legitimate.

        vi.   The Term Sheet included a term stating: "[o]rganization of a warehouse and trading facility for future deliveries and cooperation."  Based on my training, experience, and participation in this investigation, I believe that this was a reference to CC-1 and CC-2's expectation of supplying weapons to the DTO on a continuing basis.

### August 19, 2016: CC-1 and CC-2 Meet with the CSes and Show the CSes Samples of Military-Grade Weapons

    23.  Based on my conversations with CS-1, I have learned that in the weeks following the August 2, 2016 Meetings, CC-1 remained in contact with CS-1, and a meeting was arranged for August 19, 2016, in City-1.

    24.  On or about August 19, 2016, at the DEA's direction, the CSes conducted two meetings with CC-1 and CC-2 in City-1 (the "August 19, 2016 Meetings").

First Meeting on August 19, 2016

25. All three CSes met with CC-1 and CC-2 in the first meeting on August 19, 2016 (the "First August 19, 2016 Meeting"), which was audio- and video-recorded. Law enforcement personnel from Country-3 conducted surveillance of the First August 19, 2016 Meeting. Based on my review of DEA reports and recordings of the First August 19, 2016 Meeting, and my communications with the CSes, I have learned that the following occurred at the First August 19, 2016 Meeting, in substance and in part:

a. CC-1, CC-2, and the CSes initially convened at a hotel in City-1.

b. The parties again discussed that the weapons supplied by CC-1 and CC-2 in the Weapons Transaction would be used by the DTO to protect its shipments of cocaine from Mexico into the United States. For example:

i. CS-1 described the DTO as a "cartel of Mexico" involved in "drug trafficking all over the world and especially to America." CS-1 informed CC-1 and CC-2 that the DTO's most profitable shipments were "to New York."

ii. CS-1 explained that the DTO was "starving for guns," as there was "a war between all the cartels and the U.S. government." CS-1 stated that "from Mexico, we send the loads with the guys, with weapons to secure the loads, . . . to Arizona," and ultimately "to New York," where "the coke" was sold for "between 75 to 70 thousand U.S. dollars" per "ki" (i.e., kilogram). CC-1 indicated that he understood, and relayed to CS-1 that CC-2 was impressed that the DTO was obtaining $70,000 per kilogram.

iii. The parties discussed the possibility of CC-1 and CC-2 acquiring multi-ton quantities of cocaine from the DTO, through the CSes, for the purpose of selling the cocaine in Europe.

c. CC-1 and CC-2 invited the CSes to visit their warehouse outside City-1 ("Warehouse-1"), for the purpose of viewing weapons. Warehouse-1 is located at the address listed on the Business Cards provided by CC-1 and CC-2 to the CSes at the First August 2, 2016 Meeting, see supra ¶ 21(f). At Warehouse-1, CC-1 and CC-2 showed the CSes an array of military-grade weapons.

     d.    Following the visit to Warehouse-1, CC-1 showed the CSes additional military-grade weapons at a second warehouse ("Warehouse-2" and, together with "Warehouse-1," the "Warehouses"), which was also located outside City-1 (CC-2 remained at Warehouse-1).  A sign posted on the property containing Warehouse-2 displayed the name of the Company (that is, the company identified on the Business Cards provided by CC-1 and CC-2).  The CSes took photographs of the weapons displayed at the Warehouses, including the following:



Photograph-1



Photograph-2



Photograph-3



Photograph-4



Photograph-5



Photograph-6



      e.  Based on my training, experience, and review of open source materials, I believe that:

         i.  Photograph-1, Photograph-2, and Photograph-3 depict various types of machineguns.

         ii.  Photograph-4 depicts a mortar launcher.

         iii.  Photograph-5 depicts missiles, which appear to be air-to-air or air-to-surface missiles originating from Country-5.

         iv.  Photograph-6 depicts an amphibious assault vehicle (as referenced in the Term Sheet, see supra ¶ 22(b)(iv).

      f.  In the course of the visits to the Warehouses, the CSes, CC-1, and CC-2 agreed to reconvene in City-1 later that night to review the terms of the Weapons Transaction.

### Second Meeting on August 19, 2016

26.  Later that night (of August 19, 2016), at the DEA's direction, the CSes met with CC-1 and CC-2 in City-1 (the "Second August 19, 2016 Meeting"). Law enforcement personnel from Country-3 conducted surveillance of the Second August 19, 2016 Meeting, which was audio- and video-recorded. Based on my review of DEA reports, recordings of the Second August 19, 2016 Meeting, and a draft transcript and translation of the Second August 19, 2016 Meeting,[6] and my communications with the CSes, I

---

[6] The Second August 19, 2016 Meeting was conducted principally in English. From time to time during the course of the meeting, CC-1 and CC-2 spoke to each other in Russian.

have learned that the following occurred at the Second August
19, 2016 Meeting, in substance and in part:

a.    CC-1 and CC-2 inquired about the possibility of
acquiring multi-ton quantities of cocaine from the DTO, through
the CSes, for the purpose of selling the cocaine in Europe.

b.    CC-1 and CC-2 provided the CSes with an invoice
(the "Invoice") reflecting the quantities and prices of weapons
that would be sold to the CSes in Country-3 (as described above,
the parties contemplated that representatives of the DTO would
pick up additional weapons from CC-1 and CC-2's warehouse in
Country-6 as part of the Weapons Transaction).   I have reviewed
the Invoice, which includes the following information:

i.    The Invoice bears the name of the Company
associated with CC-1 and CC-2.

ii.    The Invoice itemizes three different types of
machineguns (Skorpion vz, KPVT, and PKT), and indicates that a
total of 5,280 machineguns would be supplied.

iii.    The Invoice states a total price of €2,000,000,
and provides bank account information for the Company.

### September and October 2016: The Defendant, CC-1, and CC-2 Remain in Contact with the CSes Regarding the Weapons Transaction

27.    Based on my communications with CS-1 and CS-3, and my
review of consensually recorded telephone calls and text
messages exchanged via the Application, I have learned that
since the August 19, 2016 Meetings, CS-1 and CS-3 have remained
in contact with HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu,"
the defendant, CC-1, and CC-2 regarding the consummation of the
Weapons Transaction.   For example:

i.    On or about September 16, 2016, CS-1 and CS-3
engaged in a consensually recorded telephone call with CC-1.   In
the course of that call, CC-1 indicated that he and CC-2 were
ready to execute the Weapons Transaction:   "We are just waiting
for you guys [i.e., the CSes], because from our side, everything
is ready."   Following that call, on or about September 17, 2016,
CC-1 and CS-1 exchanged text messages, during which CC-1
informed CS-1 that he (CC-1) remained in contact with
NASIRLIOGLU regarding the Weapons Transaction, and that
NASIRLIOGLU might be growing suspicious:   "James told me not to
talk to you . . . he told me that he s sniffing smth wrong."

     b.   On or about September 16, 2016, at the DEA's direction, CS-1 and CS-3, while in New York City, engaged in a recorded telephone call with NASIRLIOGLU.  In the course of that call, CS-1 advised NASIRLIOGLU that he/she and CS-3 were in New York "pushing the product," *i.e.*, carrying out the drug trafficking business of the DTO.  In the course of discussion regarding the Weapons Transaction, NASIRLIOGLU stated:  "We are working since one year [ago] . . . .  We are ready 100% to close the deal."

     WHEREFORE, your deponent respectfully requests that a warrant be issued for the arrest of HAMIT NASIRLIOGLU, a/k/a "James Nasirlioglu," the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

                  MICHAEL CONNOLLY
                  Special Agent
                  Drug Enforcement Administration

Sworn to before me this
12th day of October, 2016

THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK